Farrell COPPIN, Appellee,

v.

SHELTER MUTUAL INSURANCE COMPANY, a Missouri corporation, Appellant.

No. 64287.

Court of Appeals of Oklahoma, Division No. 4.

Aug. 4, 1987.

As Corrected Sept. 18, 1987.

Stephen J. Scherer, Mayes and Scherer, Inc., Muskogee, for appellee.

Joseph A. Sharp and Lynn A. Summers, Best, Sharp, Thomas, Glass & Atkinson, Tulsa, for appellant.

BRIGHTMIRE, Presiding Judge.

Among the issues raised by the appealing defendant is one challenging the propriety of certain substantive instructions given by the trial court which defendant claims was a reversible error that deprived it of a fair trial.

We agree with this contention.

## I

Underlying the controversy are these uncontroverted facts. In December 1982, plaintiff, Farrell Coppin, applied for insurance coverage on his Muskogee County residence through an agent of defendant Shelter Mutual Insurance Company. The two-page application which was filled in by the agent's secretary and signed by plaintiff, did not disclose an insured fire loss suffered by plaintiff several years earlier, or that his house was for sale. The agent inspected plaintiff's property, took a picture of it, and advised plaintiff that it was covered effective December 30, 1982.

On August 29, 1983, personal property belonging to plaintiff with a stipulated value of $9,714.48 was stolen from his premises—a loss covered by the Shelter policy. Plaintiff made a claim for the loss which precipitated an investigation by the carrier to determine if any ground existed for denying the claim. Eventually, it was denied for the reason that neither the plaintiff's earlier fire loss nor the fact his house was up for sale was disclosed on the lengthy application. This lawsuit ensued.

In its answer Shelter admitted issuing a homeowner's policy to plaintiff which it says, on the one hand, was "in effect at the time of the theft loss", and on the other hand, was "void ab initio" because plaintiff "made misrepresentations, omissions, and concealed facts and/or made incorrect statements which were fraudulent or material to the acceptance of the risk or the hazard assumed by the insurance carrier; or that the insurer in good faith would not have issued the policy if the true facts had been known to this defendant."

At trial during plaintiff's presentation of a prima facie case certain evidence was also elicited tending to support Shelter's defenses. Shelter's demurrer to plaintiff's evidence was overruled and it offered further evidence with regard to nondisclosure of the fire loss and marketing of the house.

Plaintiff's effort to rebut the defense consisted of this: The answers on the policy, he said, were written in by the agent's secretary during a telephone interview. With regard to the fire loss matter, plaintiff said he told an adjuster during a tape-recorded interrogation that he did not mention the seven-year-old fire loss to the secretary because she asked about losses that had occurred within the preceding two or three years. And with respect to the sale of his property plaintiff pointed out that Shelter in fact knew about it, indeed had documentary proof of it, by virtue of a photograph its agent had taken of the front of the house during the inspection made before deciding to issue a binder—a photograph which had to show the "for sale" sign planted in the front yard.

The dispute was tried to a jury which returned a verdict in favor of plaintiff for the stipulated amount of the loss. Shelter appeals advancing several propositions in support of its bid for a new trial.

## II

Shelter's first assignment of reversible error is the giving of a directory instruction which, among other things, failed to permit a jury finding with respect to one of its two theories of defense.

■ This contention has merit. In its answer Shelter alleged three factless conclusions in defense of its denial of plaintiff's claim, namely, that plaintiff made misrepresentations and concealments which were "[1] fraudulent or [2] material to the acceptance of the risk or the hazard assumed by the insurance carrier; or [3] that the insurer in good faith would not have issued the policy if the true facts had been known to this defendant." These conclu-

sions closely parallel the three recovery-preventing items set out in 36 O.S.1981 § 3609.[1] At trial, however, Shelter emphasized the first two defensive conclusions although it did mention the third one in a requested instruction. Likewise, in its appellate brief, Shelter narrows its defense theories to the first two statutory recovery preventatives and argues that in giving Instruction No. 15—a directory charge which partially included only one of its two defensive theories—the court incorrectly directed that the jury's verdict "shall be for the plaintiff" if it finds "that the plaintiff did not make a false statement or misrepresentation in the insurance application, or that if he did, it was not made in bad faith or with the intent to deceive."[2]

The argument is that not only did the trial court erroneously inject an irrelevant issue—plaintiff's faith—but it failed to permit the jury to pass on Shelter's second theory—that plaintiff made *material* misstatements of fact which induced Shelter to provide subject coverage.

Plaintiff responds to the attack by pointing to Instruction No. 10—a verbatim statement of § 3609—and contends it cured any defect in No. 15 because the jury was instructed to read the instructions as a whole.

This response, while it sounds pretty good, does not as a practical matter furnish an acceptable basis for resolving the issue. If one instruction directs the jury to render a certain verdict upon finding a particular thing to be a fact, we are at a loss to understand how the jury can follow such direction and at the same time in some way apply supplementary legal information supplied in another instruction like, say, No. 10. Plaintiff says the problem can be resolved nicely by assuming the jury read the two instructions together as they were supposed to have, and should have, done. This, we think, is an implausible rationalization. The successful undertaking and execution of such a feat by a jury is difficult to perceive. The only way the jury can reconcile the two instructions is to add the findings of parts 2 and 3 of No. 10 to the findings required in the directive of No. 15 and ignore that part of the directive requiring the finding of bad faith.

This, of course, is tantamount to asking the jury to merge or restructure the instructions and apply them as recast—an objective we daresay, aside from being improper, has to remain in the realm of fantasy given the current limitations of modern man's mental and intellectual capabilities. We are certain the trial court would have

---

1. The full text of § 3609 is:

All statements and descriptions in any application for an insurance policy or in negotiations therefor, by or in behalf of the insured, shall be deemed to be representations and not warranties. Misrepresentations, omissions, concealment of facts, and incorrect statements shall not prevent a recovery under the policy unless:

1. Fraudulent; or
2. Material either to the acceptance of the risk, or to the hazard assumed by the insurer; or
3. The insurer in good faith would either not have issued the policy, or would not have issued a policy in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or otherwise.

2. Instruction No. 15 reads:

Ladies and gentlemen of the jury, the plaintiff claims that he took out a homeowner's policy of insurance with the defendant and there-

after he suffered a theft loss in the sum of $9,714.48, that he made a claim with the defendant insurance company and it was denied.

The defendant insurance company contends that they would not have issued the policy of insurance to the plaintiff if the plaintiff had not made false statements or misrepresentations in the insurance application and the true facts had been known to the insurer.

*Ladies and gentlemen, if you find and believe by a preponderance of the evidence that the plaintiff did not make a false statement or misrepresentation in the insurance application, or that if he did, it was not made in bad faith or with the intent to deceive, then in that event your verdict shall be for the plaintiff in the amount sued for, to-wit, $9,714.48.*

*But, on the other hand, if you find and believe by a preponderance of the evidence that the plaintiff did make false statements or misrepresentations in the insurance application and that the statements were made in bad faith and with the intent to deceive the insurance company, then in that event your verdict shall be for the defendant.* (Emphasis added.)

been appalled if the jury had returned to the courtroom or sent a note asking if it could do just that—or, what would perhaps have been more embarrassing—requested the court to do it for them!

An analysis of Instruction No. 15 and a review of its legal shortcomings will make more vivid the fallacy of plaintiff's position. The jury was obliged to return a verdict for plaintiff if one of two root facts were found: (1) That plaintiff did not make a false statement on the application; or (2) if he did, it was not made in bad faith or with intent to deceive. Under the evidence the jury could find the former because of evidence that the agent's secretary orally modified or misconstrued the application loss question on the telephone, and, of course, if no misrepresentation was found to have been made then plaintiff was entitled to a verdict. The alternative root, however, was not sufficient to authorize a verdict for defendant on its theories of (1) fraudulent representations or (2) innocent misrepresentation of a fact material to the risk to be assumed by Shelter. Furthermore, Instruction No. 15 improperly implied that any type of false statement, material or immaterial, made by plaintiff in "good faith" could not under any circumstance be the basis for rescinding the insurance contract. In other words, not only was the second directory root contrary to law as set out in both our contract statutes and the insurance code, but the instruction failed, among other things, to direct the jury to return a verdict for defendant if it found that plaintiff made a *material* misrepresentation of a fact in the application which was intended to cause and did cause defendant to accept the risk it did, unless the jury further found that the misrepresentation was induced or approved by the agent; or that the true fact was known, or should have been known, by the insurer before it issued the policy; or that the insurer would have issued the policy even had it known the true fact.[3]

Finally, inasmuch as the case must be retried we think it would be helpful to give our views on the inappropriateness of reading § 3609 in the form of an instruction. It contains a number of words and phrases irrelevant to this case, some bordering on what might be called legalese. And aside from numbered paragraph 3 not being applicable in this case, the validity of such paragraph is suspect because it is too vague, too sweeping, and too ambiguous to be meaningful or enforceable. For example, in view of the first two numbered paragraphs specifying fraud and material misrepresentation as impediments to loss recovery on a policy, the third paragraph must inferentially be construed to prevent a policyholder from recovering for a loss under a policy in force, if the insurer can "prove" through its agents that the applicant made some kind of an *immaterial* misstatement the truth of which, had it been known, would have resulted in a "good faith" refusal to issue the policy. Not only does this tend, unlike the first two paragraphs, to conflict with our statutory law pertaining to the tortious inducement of an agreement, but it opens the door to arbitrary and capricious after-the-fact rejection of claims by an insurer.[4]

Section 3609 must be interpreted in harmony with the general law pertaining to contracts. Its primary purpose is to provide relief from a policy the insurer was induced to issue as a result of fraudulent or nonfraudulent misrepresentation of material facts by the insured unless: (1) Such misrepresentation was encouraged, sought, induced, or approved by the insurer, or its agent; or (2) there was no reliance—the insurer knew or should have known the true facts before it issued the policy; or (3) the insurer would have issued the policy even had it known the true facts.

### III

The next error argued by Shelter—the refusal of the court to give its requested Instruction No. 1—is without merit.

Subject instruction reads:

---

3. See 15 O.S.1981 §§ 51–75; 76 O.S.1981 §§ 2–4; See also *Kelly v. Robertson,* 61 Okl. 85, 160 P. 46 (1916).

4. *See* 15 O.S.1981 §§ 51–75.

You are further instructed that if you find Shelter Mutual Insurance Company would not have issued the policy if the true facts had been made known as required by the application; and if you find that the act of non-issuance would have been done in good faith, then you shall find in favor of the defendant in this case and against the plaintiff.

■ It was, as we indicated, not error to refuse the request. The proposed charge, also a directory-type instruction, possesses a flaw similar to the one given by the court in that it does not correctly identify the predicatory findings necessary to warrant the specified directed verdict.

In the first place the suggested instruction standing alone is too vague, indefinite, and incomplete for a stand-alone directory instruction and we do not see how it could have been sensibly incorporated into Instruction No. 15. In the second place, as we have seen, neither of the two predicatory or root findings posited was correct in that the first one did not mention materiality and the second one featured an irrelevancy—faith of Shelter—because of the absence of a requirement that the misrepresentations made be material.

### IV

Shelter's third assignment of reversible error is the overruling of its motion for a directed verdict. We combine this assignment with its fifth one which complains of the verdict being without support of competent evidence.

We have examined the record and are of the opinion that there was sufficient evidence to establish a prima facie right of plaintiff to recover under the subject policy.

### V

The fourth complaint of Shelter is that plaintiff made a prejudicially improper closing jury argument.

The condemned argument, which was not the subject of an objection, related to Shelter's evidence that it would not or could not have issued the policy had it known of plaintiff's previous fire loss. After pointing to the testimony of a Shelter official to the effect the company would have issued a policy under certain circumstances regardless of any previous loss, counsel for plaintiff remarked that there "are several things that could have happened. Maybe they would have increased the premium ... maybe they would not have offered coverage for a fire. A lot of things could have happened."

■ How this argument could have prejudiced Shelter escapes us. The explanation offered by the carrier is this: It is "well recognized that the mere mentioning of an insurance company as a party or associated with a party tends to create a belief in the jurors' minds that that party can pay for any and all damages being claimed." Whatever may be said about the lack of relevancy of this ideology to the complaint made, the assumptive generalization is not recognized by this court to be anything other than a defense-bred myth.

In the first place how is plaintiff going to sue Shelter without naming it as a party defendant? Perhaps by referring to the carrier as "Triple X Doe"? Or maybe as "Hoe Doe, Inc."? In the second place it is unrealistic to think that jurors on the one hand do not assume insurance underlies nearly every case that is tried, or that jurors on the other hand will go berserk if the term "insurance" is mentioned. For the fact of the matter is that there is no acceptable evidence plaintiffs are benefited by the mention of insurance or its implied existence. Indeed, if anything, the obverse is more probable—that some jurors may have been instilled with a self-interest bias against the right of plaintiffs to recover adequate compensation by a constant barrage of unverified widely disseminated propaganda aimed at convincing potential jurors that the direct and principal reason for the exorbitant insurance rates they are forced to pay is what is characterized as "enormous," "wild," or "astronomical" verdicts rendered by ordinary citizens summoned to serve.

The inescapable conclusion is, then, that the complained-of argument was no more

than a justifiable speculative response to a speculative defense and was within permissible bounds of fair argument.

## VI

Finally complaint is made of the exclusion of a tape recording—which counsel said was made of a conversation between defendant's adjuster and plaintiff, not long after plaintiff's theft loss—after a portion of it was played to the jury.

The background for this complaint is somewhat unusual and has a bearing on the merits of defendant's contention. During cross-examination of plaintiff, defense counsel elicited that plaintiff recalled a conversation with a Shelter adjuster, a fellow whose name the defense lawyer said was Clucevesk, about two months after the theft loss. This colloquy followed:

"Do you remember being asked this question and giving this answer?" plaintiff was asked by the defense lawyer.

"(Whereupon Mr. Holden, attorney for the defendant, began playing an unidentified tape recording without permission of the Court)," said the reporter.

"Wait!" ordered the court, "Just hold it! The [*sic*] turn that off!"

"Are you aware of this?" the court asked plaintiff's lawyer.

"No, sir," he answered.

Following an objection on the ground that no predicate had been laid for the tape recording, the court excused the jury and the matter was further discussed. Plaintiff confirmed that he had a discussion after the loss with Shelter's adjuster on November 11, 1983, that it sounded like the adjuster's voice as well as his own on the tape, and that he recalled the question and answer chosen by defendant to be played. The trial court overruled plaintiff's objection and allowed the jury to hear that portion of the tape chosen by defendant which consisted of admissions by plaintiff that he had a fire loss about six or seven years earlier, that the application contained a negative answer in that regard, and that he "guessed" he gave the preparer of the application that information because, he

said, "I thought that she asked me [about] the last two or three years. When the application was filled out, had that occurred, any fire or anything occurred in the last two or three years."

Following this defense counsel moved "to introduce the tape." Plaintiff renewed his objection and the court sustained it on the ground that since the jurors had heard it, there "is no need to introduce it."

"All right," responded defense counsel.

■ The defense lawyer was clearly out of line in suddenly turning on a tape recording for the jury to hear without any kind of a predicate having first been laid for its use or admission into evidence. It was a devious way of getting to the jury certain alleged testimony of a person the defense lawyer said was defendant's adjuster without that person having to come to court, take the stand, or be subjected to voir dire or cross-examination. The only foundation for the validity of the tape recording was the speculative conjecture of plaintiff who of course had no firsthand knowledge about the tape recording itself. What else was on the tape remained a mystery. The only error committed by the court was permitting part of the recording to be heard by the jury under the circumstances and since defendant invited the error and it inured to the benefit of defendant, it will not be heard to complain.

Refusal to admit the tape into evidence was not error.

## VII

The judgment on the jury verdict of March 6, 1985, is reversed and the cause remanded for a new trial.

RAPP and STUBBLEFIELD, JJ., concur.