**FIRSTIER MORTGAGE CO., a/k/a Realbanc, Inc., Plaintiff,**

v.

**INVESTORS MORTGAGE INSURANCE CO., Defendant.**

**No. CIV-87-564-B.**

United States District Court,
W.D. Oklahoma.

March 3, 1989.

Jack S. Dawson, Janice M. Dansby, Miller, Dollrhide, Dawson & Shaw, Oklahoma City, Okl., for plaintiff.

John P. Roberts, Edwards, Roberts and Propester, Eric S. Gray, Gregory F. Pilcher, Roberts, Gray, Goresen & Moriarty, Oklahoma City, Okl., for defendant.

## MEMORANDUM OPINION

BOHANON, District Judge.

This matter is before the court on the Defendant, Investors Mortgage Insurance Co.'s ("IMI"), Motion for Summary Judgment under Rule 56 of the Federal Rules of Civil Procedure.

The plaintiff, Firstier Mortgage Co., a/k/a Realbanc, Inc. ("Firstier"), commenced this suit against the alleged bad faith failure of IMI to pay Firstier's claims on eight policies of private mortgage insurance underwritten by IMI. IMI defends by arguing that under Okla.Stat. tit. 36, § 3609 the policies are void because of misrepresentations, omissions, concealments of facts, and incorrect statements made by or in behalf of Firstier in the applications and negotiations for the insurance policies. IMI claims that such misrepresentations, omissions, concealments of facts, and incorrect statements were fraudulent and material to the acceptance of the risk or hazard assumed by IMI. In addition, IMI claims that if it had known the true facts, IMI in good faith would not have issued the eight policies of private mortgage insurance.

Being a drastic measure, summary judgment should be granted with caution. *Machinery Center, Inc. v. Anchor National Life Insurance Co.*, 434 F.2d 1 (10th Cir. 1970). At the same time, due regard must be given, not only to the rights of the plaintiffs to have asserted claims which are adequately based on law and in the facts to be tried by a jury, but also to the defendants' rights to show, before trial, that such claims have no factual basis. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Still the evidence and all reasonable inferences must be viewed in the light most favorable to the plaintiff. *Bruce v. Martin Marietta Corp.*, 544 F.2d 442 (10th Cir. 1976). If the court determines that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law, summary judgment should be granted. *Id.* at 445. To determine if there is a need for trial, the court must pierce the pleading and evaluate the proof in the case. Fed.R.Civ.P. 56 advisory committee notes. After a motion for summary judgment, the plaintiff cannot rely on *mere conclusions* but must present sufficient evidence to establish that his claim has merit. *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985).

Having read the briefs and reviewed the exhibits and the parties' submissions, and having heard the arguments of counsel, the court makes the following findings of fact and conclusions of law:

### Findings of Fact

1. IMI underwrites private mortgage insurance that insures lenders against losses sustained on mortgage loans because of default by the borrowers.

2. In January, 1983, Firstier financed eight first mortgage loans on eight duplexes located in Elk City, Beckham County, Oklahoma. Firstier applied to IMI for private mortgage insurance coverage on each of the eight mortgage loans.

3. In connection with seeking private mortgage insurance from IMI to cover each of the eight mortgage loans, Firstier prepared, compiled and submitted eight in-

surance application packages to IMI. Each application included the following documents:

a. Loan Application of Borrower,
b. Credit Report for Borrower,
c. Verification of Borrower's income
d. Deposit Verification(s),
e. Property Appraisal,
f. Sales Contract,
g. Firstier's Summary of Loan Transaction, and
h. Affidavit of Purchaser and Vendor.

4. Subsequent to receiving the eight applications from Firstier, IMI issued a Commitment/Policy covering each of the mortgage loans. The policy number on the Commitment/Policy as well as the borrower's name and the real property purchased are as follows:

| Policy Number | Name/Address |
|---|---|
| 456987 | Parke H. and Glenda A. Largent<br>107 Cripple Creek Lane<br>Elk City, Oklahoma |
| 456988 | Parke H. and Glenda A. Largent<br>105 Cripple Creek Lane<br>Elk City, Oklahoma |
| 457066 | Henry M. and Janice C. Staat<br>109 Cripple Creek Lane<br>Elk City, Oklahoma |
| 457078 | Larry E. Busking<br>103 Cripple Creek Lane<br>Elk City, Oklahoma |
| 457225 | Keith H. and Paula K. Busking<br>123 Cripple Creek Lane<br>Elk City, Oklahoma |
| 457246 | Don W. Armstrong<br>125 Cripple Creek Lane<br>Elk City, Oklahoma |
| 457247 | Don W. Armstrong<br>121 Cripple Creek Lane<br>Elk City, Oklahoma |
| 457224 | Charles O. and Mary Ann Wolfes<br>111 Cripple Creek Lane<br>Elk City, Oklahoma |

5. Each Affidavit of Purchaser and Vendor submitted by Firstier was signed both by Firstier and by the purchaser and vendor. Each Affidavit of Purchaser and Vendor states, among other things, that the total purchase price for each property is $94,000.00, that each borrower has a cash equity equal to $18,800.00, and that the first mortgage amount is $75,200.00. In addition, each Affidavit states that the prepaid expenses involved in the loan transaction have not been paid by the vendor. Each Affidavit of Purchaser and Vendor also states that the certifications of the Affidavit are for the purpose of inducing the mortgage insurer to insure the loan.

6. Settlement statements were prepared on each of the eight loans. Each of the settlement statements was signed by the seller, the respective buyers, and by the settlement agent. Each of the settlement statements indicates that cash was paid from the borrower at the closing. However, none of the borrowers paid cash at the various closings. Instead, the seller, Bill Tucker, made the down payments for each of the borrowers resulting in no equity in the purchaser.

7. Firstier admits that Henry M. and Janice C. Staat made no earnest deposit or down payment in connection with the purchase of property in Elk City, Oklahoma, commonly referred to as 109 Cripple Creek Lane. The settlement statement prepared in connection with this loan transaction states that the borrowers were to pay $14,646.52 at closing. However, this amount was paid by Bill Tucker, the seller, resulting in no equity in the purchaser.

8. Firstier admits that Larry E. Busking made no earnest deposit or down payment in connection with the purchase of property in Elk City, Oklahoma, commonly referred to as 103 Cripple Creek Lane. The settlement statement prepared in connection with this loan transaction states that the borrower was to pay $14,810.29 at closing. However, this amount was paid by Bill Tucker, the seller, resulting in no equity in the purchaser.

9. Firstier admits that Don W. Armstrong made no earnest deposit or down payment in connection with the purchase of properties in Elk City, Oklahoma, commonly referred to as 121 and 125 Cripple Creek Lane. The settlement statements prepared in connection with these loan transactions state the borrower was to pay $16,615.43 at the closing of each loan. However, these amounts were paid by Bill Tucker, the seller, resulting in no equity in the purchaser.

10. Firstier admits that Keith H. and Paula K. Busking made no earnest deposit or down payment in connection with the purchase of property in Elk City, Oklahoma, commonly referred to as 123 Cripple Creek Lane. The settlement statement prepared in connection with this loan transaction states that the borrowers were to pay $16,721.52 at closing. However, this amount was paid by Bill Tucker, the seller, resulting in no equity in the purchaser.

11. Parke H. and Glenda A. Largent made no earnest deposit or down payments in connection with the purchase of the properties in Elk City, Oklahoma, commonly referred to as 107 and 105 Cripple Creek Lane. The settlement statements prepared in connection with these loan transactions state that the borrowers were to pay $14,835.29 at each closing. However, these amounts were paid by Bill Tucker, the seller, resulting in no equity in the purchaser.

12. Charles O. and Mary Ann Wolfes made no earnest deposit or down payment in connection with the purchase of property in Elk City, Oklahoma, commonly referred to as 111 Cripple Creek Lane. The down payment on the property was paid by Bill Tucker, the seller. The settlement statement prepared in connection with this loan transaction states that the borrowers were to pay $14,721.52 at closing. However, this amount was paid by Bill Tucker, the seller, resulting in no equity in the purchaser.

13. The vendor and the respective borrowers executed the Affidavits of Purchaser and Vendor for the purpose of inducing IMI to underwrite private mortgage insurance covering the loans. In the Affidavits of Purchaser and Vendor, the borrowers and the vendor falsely represented the true purchase price of the properties. The borrowers and the vendor also falsely represented that the borrowers made down payments and had personal funds at risk on each of the eight loans; it is unquestionable that the purported borrowers had no cash equity in any of the properties.

14. The Affidavits of Purchaser and Vendor were submitted to IMI by Firstier for the purpose of inducing IMI to insure the subject loans. In each of the eight Affidavits of Purchaser and Vendor, Firstier represented that the total purchase price for each property was $94,000.00, that the mortgage amount was $75,200.00, that the loan-to-value ratio was eighty percent (80%), and that each borrower had a cash equity in the respective properties equal to twenty percent (20%) of the purchase price. These representations were false. Because the borrowers made no down payments and had no equity in the properties, it is unquestionable that Firstier provided one hundred percent (100%) financing on each property and that the true loan-to-value ratio was one hundred percent (100%). Loan-to-value ratio is defined in IMI's Underwriting Guidelines as the loan amount divided by the appraised value or sales price, whichever is lower.

15. Firstier signed the commitment/policies issued by IMI. Each of the eight commitment/policies expressly states that Firstier made the following representations:

> REPRESENTATIONS: The Insured Lender hereby represents that the loan transaction designated above has been closed, such loan is not in default, any special conditions set forth herein have been satisfied, that the Buyer–Seller Affidavit and other necessary documents have been forwarded to the Company, and that the appropriate premium indicated below has been paid to the Company.

The commitment/policies issued by IMI and signed by Firstier stated that each of the loan transactions possessed the following characteristics:

1. A loan-to-value ratio equal to eighty percent (80%);

2. A selling price equal to $94,000.00; and

3. An appraised value equal to $94,000.00.

It is unquestionable that these representations were false. Because the seller made the down payments for the buyers, the true sales price was $75,200.00 on each property. Further, because Firstier made loans equal to the sales price, the true loan-to-value ratio on each property was one hun-

dred percent (100%). Finally, the evidence is convincing that the appraised value is substantially overstated given that the true selling price was only $75,200.00.

16. The settlement agent in each of the eight mortgage loan transactions was Brenda Lowery from American First Abstract Company. Firstier gave instructions to the settlement agent on a document known as a closing request transmittal rather than sending its own representative to the closings. Thus, although Firstier did not select the particular settlement agent, the settlement agent acted on Firstier's behalf and as Firstier's agent in closing the eight loans at issue in this case.

17. Pursuant to Firstier's instructions, Ms. Lowery was aware that the loan-to-value ratio could not exceed eighty percent (80%) and knew that the borrowers did not make down payments on any of the eight mortgage loans at issue in this case. Because the cash due from the borrowers at the closing was paid by Bill Tucker, the seller, it is clear that Ms. Lowery knew that Mr. Tucker made the down payments for the borrowers.

18. IMI does not knowingly insure investor owned property mortgage loans where the loan-to-value ratio is greater than ninety percent (90%), the borrower's equity or down payment in the property is not at least ten percent (10%) of the purchase price of the property, and the sale and purchase of the property is not an arm's length transaction.

19. Under Local Rule 14, it is undisputed that IMI, in good faith, would not have issued any of the eight commitment/policies if IMI had been aware that the borrowers did not make down payments, that the borrowers had no equity in the property, that the true loan to value ratios were greater than eighty percent (80%), or that the appraised values and selling prices were substantially inflated. In short, IMI would not have issued the insurance policies at issue in this case had the true facts about each of the loan transactions been made known to IMI as required by the insurance applications.

20. The misrepresentations made in connection with the loan-to-value ratio, the borrowers' equity or loan payments in the property, and the purchases and sales of the properties were material to the acceptance of the risk assumed by IMI when it issued the insurance policies at issue in this case.

21. IMI denied Firstier's claims for loss under the eight insurance policies because of material misrepresentations, omissions, concealment of facts, and incorrect statements either made to or supplied to IMI by Firstier.

22. Although IMI independently decides whether to underwrite insurance on any given mortgage loan, IMI's decision whether to insure a lender against loss sustained by reason of default by a borrower is based solely upon the documentation and representations submitted as part of the application for insurance. IMI did not deviate from its normal procedure in this case. IMI relied solely upon the packet of materials furnished by Firstier to IMI in determining whether to underwrite insurance on the eight loans involved in this case. The independent review that IMI conducts before issuing a commitment/policy consists only of reviewing the packet of materials furnished to IMI by the lender. IMI did not independently verify the information contained in the packet of materials furnished to IMI by the lender before issuing insurance policies on the eight loans at issue in this case.

23. Paragraph 19(a) on the reverse side of each of the eight commitment/policies renders invalid any oral statements or representations made by IMI that purport to modify the commitment/policies. Paragraph 19(a) has no relevance to misrepresentations, concealments of facts, omissions and incorrect statements made by the lender to induce IMI to underwrite insurance.

## Conclusions of Law

1. The propriety of IMI's denial of Firstier's claims under the insurance policies at issue in this case is governed by Okla.Stat. tit. 36, § 3609. Section 3609 furnishes three separate grounds for an insur-

ance company to deny coverage on an insurance policy. Specifically, Section 3609 provides:

All statements and descriptions in any application for an insurance policy or in negotiations therefor, by or in behalf of the insured, shall be deemed to be representations and not warranties. Misrepresentations, omissions, concealment of facts, and incorrect statements shall not prevent a recovery under the policy unless:

1. Fraudulent; or

2. Material either to the acceptance of the risk, or to the hazard assumed by the insurer; or

3. The insurer in good faith would either not have issued the policy, or would not have issued a policy in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or otherwise.

2. The underwriting package that Firstier submitted to IMI in connection with procuring private mortgage insurance on the loans at issue in this case constitutes an "application for an insurance policy" within the meaning of Okla.Stat. tit. 36, § 3609.

■ 3. Section 3609 specifically encompasses representations made "by or in behalf of the insured." The court agrees and specifically finds that representations made by Firstier's borrowers in documents that Firstier submitted to IMI with the insurance applications were made in behalf of Firstier for the purpose of inducing IMI to underwrite insurance and, thus, fall squarely within Section 3609 and are material "to the acceptance of the risk, or to the hazard assumed by" IMI, so as to prevent recovery on the policies.

4. The Affidavits of Purchaser and Vendor, which Firstier acknowledges submitting to IMI with the insurance application packages, were signed by the borrowers. The Affidavits of Purchaser and Vendor expressly state that they were submitted for the purpose of "inducing the mortgage insurer, if any, to insure such loan." The Affidavits of Purchaser and Vendor represent that the borrowers each had a cash equity in their respective properties in the amount of $18,800.00, that the purchase price for each property was $94,000.00, and that the first mortgage amount was $75,200.00. However, it is undisputed that the borrowers on five of the loans insured by IMI for Firstier did not make down payments or earnest deposits. Thus, it is unquestionable that the representations made in the Affidavits of Purchaser and Vendor were false. Because these borrowers did not make down payments, they had no cash equity in the properties and the true sales price was only $75,200.00.

5. The Affidavits of Purchaser and Vendor were also signed by Firstier. Firstier represented that the total purchase price for each property was $94,000.00, that the mortgage amount was $75,200.00, that the borrowers had cash equity in the properties equal to $18,800.00, and that the loan-to-value ratio was 80%. Obviously, Firstier's representations were also false. In addition, because the borrowers had no cash equity in the properties, it is clear that Firstier provided 100% financing on the properties and the true loan-to-value ratio was 100%.

6. Firstier also made misrepresentations when it signed each of the commitment/policies. Firstier expressly represented on the commitment policies that each loan had a loan-to-value ratio equal to 80%, that the selling price of each property was $94,000.00, and that the appraised value of each property was also equal to $94,000.00. These representations were obviously false given that the borrowers had no equity in the properties and that the true loan-to-value ratios were 100%.

7. The loan-to-value ratio is material to the risk assumed by IMI. As the Ninth Circuit recognized:

LTV [loan-to-value] ratio is material because it measures risk, the touchstone of an insurance contract. As the LTV ratio increases, the risk of insuring the loan

also increases even though the amount of the loan remains the same.... The risk of insuring the loan also increases even though the amount of the loan remains the same.... The risk [the insurer] was willing to accept was implicit in the commitments, stated LTV ratios.... No down payments, however, were made. The actual loan-to-scale price ratios exceeded 100%. The risk of insurance had increased, the terms of the commitment had been modified, and [the insurer] was entitled to rescind.

*Verex Assurance, Inc. v. John Hanson Savings & Loan,* 816 F.2d 1296, 1302 (9th Cir.1987).

■ 8. It is unquestionable that the borrowers fraudulently and in bad faith misrepresented in the Affidavits of Purchaser and Vendor that they had cash equity in the properties. Such fraud was perpetrated in behalf of Firstier for the purpose of inducing IMI to underwrite insurance on the loans. Thus, pursuant to Okla.Stat. tit. 36 § 3609(1), the borrowers' fraud prevents Firstier from recovering under the policies and renders the policies void as a matter of law.

9. American First Abstract was Firstier's sole representative at the eight closings and acted pursuant to instructions from Firstier. Thus, although Firstier did not specifically select American First Abstract as the particular settlement agent, American First Abstract clearly acted on Firstier's behalf and therefore was Firstier's agent. *See e.g. Hibbard v. Ford,* 55 Okla. 563, 155 P. 510, 511 (1916).

■ 10. American First Abstract, acting as agent for Firstier at the various loan closings, knew that none of the borrowers made down payments or earnest deposits and that therefore none of the borrowers had any cash equity in the properties. It is a fundamental principal of the law of agency that the agent's knowledge is imputed to his principal. *Bailey v. Gulf Insurance Co.,* 389 F.2d 889, 891 (10th Cir.1968); *A.A. Murphy, Inc. v. Banfield,* 363 P.2d 942, 946 (Okla.1961); *Capps v. Whitegrass-Waterhole Flood Control and Soil Conservancy District,* 359 P.2d 318, 321 (Okla.

1961); *Bonded Royalties, Inc. v. Jefferson,* 174 Okla. 345, 50 P.2d 281, 283 (1935); *Allison v. Crummey,* 64 Okla. 20, 166 P. 691, 697–698 (1917). Because there is no evidence that American First Abstract was secretly acting adversely to Firstier's interest at the closings, Firstier is bound by the knowledge of its agent, American First Abstract, and is charged with the knowledge that the borrowers had no cash equity in the properties. *Bailey,* 389 F.2d at 891. Thus, it is unquestionable that Firstier submitted the insurance applications in bad faith and that such conduct constitutes fraud sufficient to void the policies under Okla.Stat. tit. 36, § 3609(1).

■ 11. Although the court finds that Firstier and its borrowers submitted the insurance applications fraudulently and in bad faith, that finding is not necessary to this court's holding. It is not relevant whether Firstier knew that it was supplying inaccurate information with the applications so long as the misrepresentations were material to the acceptance of the risk or were relied upon by IMI in deciding to issue the insurance policies. *See* Okla.Stat. tit. 36, §§ 3609(2)–3609(3). Oklahoma courts have expressly held that Okla.Stat. tit. 36, § 3609 was designed to "provide relief from a policy the insurer was induced to issue as a result of fraudulent or *nonfraudulent* misrepresentation of material facts by the insured." *Coppin v. Shelter Mutual Insurance Co.,* 742 P.2d 594, 597 (Okla.App.1987) (emphasis added).

12. Courts from other jurisdictions construing statutes identical to Okla.Stat. tit. 36, § 3609 have routinely held that even innocent misrepresentations will prevent recovery under the policy. In *McDonell v. New England Mutual Life Insurance Co.,* 380 F.2d 983, 985 (5th Cir.1967), the court of appeals upheld an award of summary judgment for the insurance company, declaring:

There may be said to be a question of fact present as to whether the admitted misrepresentations were made falsely, with intent to deceive, or were made in good faith. But the resolution of this question was not required. Even if the

incorrect statements were made in good faith, the Florida statute ... barred recovery. In a word, this issue, if assumed to be present, was immaterial. It was not a 'genuine issue as to any material fact.' (Rule 56 F.R.Civ.P.).

*See also Allstate Insurance Co. v. Winnemore,* 413 F.2d 858, 862 (5th Cir.1969); *United Guarantee Residential Insurance Corp. v. American Pioneer Savings Bank,* 655 F.Supp. 165, 168 (S.D.Fla.1987).

13. In light of the foregoing authorities, it is clear that Okla.Stat. tit. 36, § 3609 affords relief from an insurance policy issued on the basis of material misrepresentations made in the application by or in behalf of the insured, even if such misrepresentations were made innocently and in good faith. All that Okla.Stat. tit. 36, § 3609 requires is that the misrepresentation be material to the acceptance of the risk or for the insured in good faith to prove that it would not have issued the policy with the same terms, if it had known the truth; no actual knowledge of incorrectness, untruth, or deliberate falsehood is required. *See United Guarantee Residential Insurance Corp. v. American Pioneer Savings Bank,* 655 F.Supp. at 168. Accordingly, pursuant to Okla.Stat. tit. 36, § 3609, Firstier is prevented from recovering under the policies because the documents it submitted to IMI for the purpose of inducing IMI to issue the policies contained misrepresentations that were material to the risk assumed by IMI. Indeed, it is uncontroverted that if IMI had known the true facts IMI would not have issued the policies.

14. Although Firstier has admitted only that the borrowers on five of the loans did not make earnest deposits or down payments, IMI has submitted overwhelming uncontrovertible evidence that none of the borrowers made down payments as represented in documents submitted by Firstier as part of the insurance applications. Copies of cancelled checks made payable to the settlement agent by the seller of the properties for the exact amount of the borrowers' purported down payments conclusively establish that the seller made the down payments for *all* of the borrowers and that the borrowers in fact had no cash equity in the properties. Firstier has failed to come forward with any credible evidence to controvert these facts. The unsupported statements of Firstier's borrowers is not sufficient in the face of such evidence to get past summary judgment. On a motion for summary judgment the movant is not required to show that the evidence "unmistakably" is in its favor. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). The movant must show only that a "fair-minded jury could [not] return a verdict for the plaintiff on the evidence presented." *Id.* On this record and in light of the overwhelming documentary evidence adduced by IMI, it is clear that no jury could reasonably find that any of the borrowers made down payments or otherwise had cash equity in the property as represented to IMI.

15. The court concludes that there is no genuine issue as to any material fact and that IMI is entitled to a judgment as a matter of law. Because the insurance applications contained misrepresentations that were material to the risk assumed by IMI and because Firstier submitted the insurance applications fraudulently and in bad faith, the eight insurance policies at issue in this case are declared void.

In accordance with the foregoing findings of fact and conclusions of law, an order will be entered herein this day.

### ORDER AND JUDGMENT

Consistent with the Memorandum Opinion entered herein this day,

IT IS ORDERED that the following policies issued by Investors Mortgage Insurance Co. to Firstier Mortgage Co. are void and, as such, are unenforceable:

*Policy No.*
456987
456988
457066
457078
457225
457246

**1232**

*Policy No.*
457247
457224

Further, IT IS ORDERED, ADJUDGED AND DECREED that judgment is rendered in favor of the defendant and against the plaintiff.